IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| **BRADLEY STEVEN EPPERSON** § | Case No. 17-42001 | |
| xxx-xx-3599 § | | |
| § | | |
| Debtor § | Chapter 7 | |
| § | | |
| BRADLEY STEVEN EPPERSON § | | |
| § | | |
| Plaintiff § | | |
| § | | |
| v. § | Adversary No. 18-4015 | |
| § | | |
| EDUCATIONAL CREDIT § | | |
| MANAGEMENT CORPORATION § | | |
| § | | |
| Defendant § | | |
| § | | |
| § | | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon trial of the complaint filed by the Plaintiff, Bradley S. Epperson ("Plaintiff"), in the above-referenced adversary proceeding, seeking a determination that the student loan indebtedness currently due and owed to the Defendant, Education Credit Management Corporation ("ECMC"), should be discharged because it imposes an undue hardship upon the Plaintiff and his dependents, the Court issues the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, as incorporated into adversary proceedings in bankruptcy cases by Fed. R. Bankr. P. 7052.

# **FINDINGS OF FACT**[1]

1. The Plaintiff, Bradley S. Epperson, is a 54-year-old married man who resides with his wife of twenty years in a five-person household in Allen, Texas.

2. Between the fall of 1987 and the summer of 1996, the Plaintiff utilized various educational loans to finance certain tuition expenses, including payments made to the DeVry Institute of Technology in Phoenix, Arizona, where he graduated with a Bachelor of Science degree in Electronics Engineering Technology.

3. Prior to that time, the Plaintiff was awarded an Associate of Arts Degree in Computer Technology from the ABC Technical and Trade School in 1988.

4. The student loans procured by the Plaintiff qualified him to obtain various engineering positions over the course of a work career exceeding twenty years.[2]

5. Over the life of the loans, the Plaintiff has paid approximately $48,901 in service of his student loan obligations.

6. On May 9, 1997, the Plaintiff consolidated his educational loans in the cumulative amount of $47,059.54.[3]

7. Among other things, the consolidation paid the outstanding balances on the Plaintiff's various educational loans that had been tendered through both subsidized and unsubsidized disbursements through the United States Department of Education, as well as other non-governmental lenders, and consolidated them into a single loan with a fixed interest rate.

8. The Defendant, ECMC, is the present owner and holder of the consolidated note which it acquired by means of assignment on April 13, 2018 after the initiation of this adversary proceeding by the Plaintiff.[4]

---

[1] These findings of fact and conclusions of law are not designated for publication and shall not considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines.

[2] Ex. P.

[3] Ex. A.

[4] On May 7, 2018, this Court entered an order which authorized ECMC to intervene as a party-in-interest and thereby dismissing all other parties from the suit. ECMC is a non-profit corporation organized under the laws of Minnesota that was created under the direction of the U.S. Department of

9.     The Plaintiff acknowledges that the indebtedness currently owed to ECMC is an educational loan "made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit . . . " which meets the statutory definition of 11 U.S.C. § 523(a)(8)(A).

10.    On September 11, 2017, the Plaintiff, acting in a *pro se* capacity, filed a petition for relief under Chapter 7 of the Bankruptcy Code in this Court, the Hon. Brenda T. Rhoades, presiding.[5]

11.    The Plaintiff's spouse, Viktoriya Epperson ("Ms. Epperson"), did not join in the bankruptcy petition.

12.    The bankruptcy schedules filed under oath by the Plaintiff reveal that he owns a residential homestead in Allen, Texas which he valued in 2017 at $310,000, subject to an approximate mortgage debt of $192,000, thereby enjoying an equity cushion in that exempt real property asset of approximately $118,000.[6]

13.    In addition to his mortgage indebtedness of $192,000, the Plaintiff's initial bankruptcy schedules filed on the Petition Date revealed no priority debt and unsecured indebtedness totaling $29,146.70, excluding the student loan indebtedness currently under review, which was comprised primarily of accrued credit card indebtedness.[7]

14.    An additional $2,208.22 of unsecured indebtedness was added through an amended Schedule E/F filed on February 16, 2018.[8]

---

Education to provide specialized services to the department as its statutory representative responsible for defending student loan dischargeability claims in the context of consumer bankruptcies. *See generally, Note, Forgive and Forget: Bankruptcy Reform in the Context of For-Profit Colleges*, 128 HARV. L. REV. 2018, 2036 (2015).

    [5]  Ex. F at 1.

    [6]  Ex. F at 23. *But see* Ex. Q showing that the 2020 assessed value of the Plaintiff's home by the Collin County Appraisal District was $325,371.

    [7]  Ex. F at 11-34.

    [8]  *Amended Schedule E/F* [dkt #11] in bankruptcy case number 17-42001.

15. The Plaintiff also disclosed typical personal property assets for which exemptions were claimed and allowed.

16. A Notice of No Distribution was filed by the Chapter 7 Trustee on November 3, 2017.[9]

17. On August 18, 2018, an order of discharge was entered in Plaintiff's favor in the underlying Chapter 7 bankruptcy case.[10]

18. Despite having received a discharge of a considerable amount of unsecured debt, the Plaintiff nevertheless contends that his ongoing obligation to address his student loan indebtedness in the post-discharge period imposes an undue hardship upon himself and his dependents.

19. Thus, on February 23, 2018, the Plaintiff initiated the present action seeking a discharge of his student loan indebtedness to ECMC as an "undue hardship" within the meaning of § 523(a)(8) of the Bankruptcy Code.

20. The Plaintiff was the only witness in support of his case-in-chief.

21. With regard to his student loan indebtedness, the principal balance of the Plaintiff's loans as of April 20, 2018 was $39,246.14, at an interest rate of 9%.[11]

22. The Plaintiff first contends that he and his family are currently unable to maintain a minimal standard of living because of his ongoing obligation to satisfy his student loan obligations which remain due and owing to the Defendant.

23. The Plaintiff is currently employed on a full-time basis as a Quality Assurance Engineer for Abbott Laboratories for which he evaluates the efficacy and safety of various healthcare-related products to determine their fitness for distribution and sale to certain labs and medical hospitals.

---

[9] The Trustee's Notice is not assigned a docket number in the CM/ECF system. It appears between dkt ## 8-9 in bankruptcy case 17-42001.

[10] *Order of Discharge* [dkt #24] in bankruptcy case number 17-42001.

[11] Ex. L at 24.

24. As of November 2020, the Plaintiff has been employed by Abbott for four (4) years.

25. The Plaintiff currently enjoys a gross monthly income of $7,176 arising from his employment at Abbott, for an annual gross salary of $86,112.[12]

26. Over his four-year tenure at Abbott, the Plaintiff has received multiple performance-based pay increases, although such increases are provided solely at his employer's discretion.

27. The Plaintiff deducts on a pretax basis the following monthly amounts:[13]
    (a) health insurance premiums:   $ 516
    (b) flex payments:               $ 121
    (c) 401(k) contribution:         $ 215

28. At the present time, Ms. Epperson holds part-time employment with Aurora Home Health as a registered nurse involved in home health care in Plano, Texas.[14]

29. Ms. Epperson was forced to relinquish her role as a full-time nurse in 2017 due to a chronic illness.

30. Based upon her earnings of $10,330 in the first half of 2020,[15] Ms. Epperson presently has a current gross monthly salary of approximately $1,721.00 per month.[16]

---

[12] The Plaintiff is paid $3,312 in gross salary on a bi-weekly basis. Ex. 13 at 1.

[13] Ex. 13 at 1.

[14] It is now well-settled that § 523(a)(8) of the Code requires bankruptcy courts to consider the income of a non-debtor spouse when deciding whether excepting a debtor's student loans from discharge will impose an "undue hardship" on the debtor. *Lozada v. Educ. Credit Mgmt. Corp.* (*In re Lozada*), 594 B.R. 212, 224 (Bankr. S.D.N.Y. 2018); *Augustin v. U.S. Dep't. of Educ.* (*In re Augustin*), 588 B.R. 141, 150 (Bankr. D. Md. 2018); *Wynn v. Educ. Credit Mgmt. Corp.* (*In re Wynn*), 378 B.R. 140, 148 (Bankr. S.D. Miss. 2007)*; Barron v. Tex. Guar. Student Loan Corp.* (*In re Barron*)*, 264 B.R. 833, 838 (Bankr. E.D. Tex. 2001) and cases cited therein.

[15] Ex. 13 at 3.

[16] This is a reduction of $2,362 from the salary figure provided for Ms. Epperson in the Plaintiff's Schedule I filed in his bankruptcy case in 2017. Ex. F at 37.

31. Thus, the Plaintiff's household enjoys a gross monthly income of $8,897 per month, for a gross annual income total of $106,764.

32. The Plaintiff testified that he exercises very little to no monetary control in connection with his family's household budget.

33. Significant household expenses, such as mortgage payments and/or utility expenses, are paid directly by Ms. Epperson.

34. The Plaintiff acknowledged at trial that he is unable to manage the household finances because he "lacks the capacity" to deal sufficiently with bills and household expenses as they become due.

35. At all relevant times, the Plaintiff and his spouse maintain separate checking and savings accounts which are kept segregated, according to the Plaintiff, as a consequence of his inability to sufficiently control the household's day-to-day expenditures.

36. Thus, the Plaintiff and his spouse operate their household under an agreement in which they independently deposit and transfer sums into a shared savings account as a mechanism to address their monthly expenditures.[17]

37. Therefore, the Plaintiff could not testify regarding the status of banking activities by his non-debtor spouse.

38. The Plaintiff has three children: ages, 8, 13, and 13.

39. The following constitutes the Plaintiff's estimated monthly expenses as expressed in his schedules filed in his bankruptcy case, as subsequently modified by his trial testimony:

| Expense | Amount |
|---|---|
| Mortgage | $1,860.00 |
| Electricity | $300.00 |
| Water | $75.00 |
| Telephone | $390.00 |
| Internet | $75.00 |

---

[17] No monthly statements from the shared Wells Fargo savings account appear in the record.

| | |
|---|---:|
| Food | $1,000.00 |
| Children's Private School Tuition | $1,279.00 |
| Clothing | $100.00 |
| Medical/Dental | $200.00 |
| Gas | $185.00 |
| Recreation | $200.00 |
| Car 1 | $280.00 |
| Car 2 | $480.00 |
| Vehicle Registration | $80.00 |
| Personal Care/Grooming | $100.00 |
| HOA Fees | $50.00 |
| Housekeeping | $45.00 |
| Car Insurance | $290.00 |
| | Total: $6,989.00 |

40. The Plaintiff and his spouse elect to send all of their children to private school at an average aggregate cost of nearly $1,300 per month.

41. The Plaintiff testified regarding unanticipated medical and dental procedures that are often needed for his children which reduce the amount of discretionary funds available to the household.

42. The Plaintiff also testified that he suffers with mental health issues for which he has been hospitalized in the past.

43. The Plaintiff testified that he had been previously diagnosed with Bipolar disorder.

44. The Plaintiff testified that he suffers from an innate disposition toward suicidal ideation, which has led him to attempt suicide on three separate occasions.

45. The Plaintiff stated that he often suffers from impaired concentration, as well as moderate to severe mood swings, when in the midst of a depressive episode.

46. The Plaintiff insists that his condition is worsening, predicts that he will not be able to maintain employment for more than a year, and worries that he will be terminated as a consequence of his bipolarism.

47. The Plaintiff believes that his depressive condition will eventually deteriorate beyond his capacity to control.

48. The Plaintiff offered no corroborating testimony from any doctor, or any other medical source, regarding the status or treatment options related to his medical prognosis.

49. Although the Plaintiff's medical condition may have adversely impacted his ability to regulate his emotions for periods of time, it has not prevented him from obtaining gainful employment, nor has it yet significantly impacted his current employment status as an engineer at Abbott Laboratories.

50. The Plaintiff's household has no significant cash reserves to the Plaintiff's knowledge.

51. The Plaintiff insists that "we are unable to meet our bills" and that incessant demands to address various needs of his family, including his own medical condition, preclude the availability of funds to address the student loan indebtedness.

52. Yet, an "[i]nability to pay one's debts by itself cannot be sufficient [for purposes of § 523(a)(8)]; otherwise all bankruptcy litigants would have undue hardship. The exception would swallow the rule, and Congress's restriction would be meaningless. This is the genesis of the *Brunner/Gerhardt* standard, which inquires whether requiring a debtor to repay a student loan is likely to prevent the debtor from maintaining a minimal standard of living over the course of the repayment period despite good faith efforts to fulfill her obligations." *Thomas v. U.S. Dep't. of Educ.* (*In re Thomas*), 931 F.3d 449, 451 (5th Cir. 2019).

53. While certain categories of expense may certainly be characterized as beyond the Plaintiff's control, the Plaintiff failed to present sufficient evidence to demonstrate that he has attempted all feasible avenues at his disposal to manage his family's budget in an effort to address his student loan obligations.

54. The Plaintiff testified to his reluctance to adjust his housing expense to a lower amount.

55. The Plaintiff has failed to demonstrate by a preponderance of the evidence that his current housing costs are necessary for him to maintain a minimal standard of living.

56. Other than expressing his opinion, the Plaintiff produced no evidence regarding actual housing alternatives in his area.

57. The Plaintiff has failed to demonstrate by a preponderance of the evidence that downsizing from his current housing arrangement is infeasible or that it would not result in a degree of monthly savings sufficient to permit him to pay his student loan obligation while maintaining a minimal standard of living.

58. Apart from his natural affection for them, the Plaintiff provided no justification for the private school tuition costs that he has elected to pay on behalf of his children.

59. Absent a compelling reason, a debtor's decision to send a child to a private school reveals a discretionary use of income and reflects a conscious decision by a debtor to ignore the mandated repayment of his student loan obligation. *Russ v. Tex. Guar. Student Loan Corp.* (*In re Russ*), 365 B.R. 640, 645 (Bankr. N.D. Tex. 2007).

60. Without discounting the reality of economic stress created by particular expenditures which the Plaintiff and his spouse have chosen to make, the Plaintiff lives far above what can be fairly described as a minimal standard of living.

61. While certain categories of expense may fairly be characterized as beyond his control, the evidentiary record reflects little effort by the Plaintiff to control monthly expenditures or to impose reasonable household budgetary restrictions.

62. The Plaintiff essentially suggested that he should possess the discretion to provide for his family in whatever manner or mode he selects in his best judgment without reference to the fulfillment of his student loan obligation.

63. His desire to supply a higher standard of living for his spouse and his children is understandable and admirable, but it is not consistent with the test that this Court is required to apply with regard to the discharge of his student loan indebtedness.

64. The expenses incurred by the Plaintiff's household clearly reflect an elective, discretionary diversion of disposable income.

65. The Plaintiff has failed to demonstrate by a preponderance of the evidence that he has taken every fair and reasonable measure to sufficiently minimize his household expenses.

66. The Plaintiff has failed to demonstrate by a preponderance of the evidence that, based upon his current income and expenses, he cannot maintain a minimal standard of living for himself and his dependents unless he receives a discharge of

his student loan indebtedness.

67. "A debtor need not live in abject poverty to satisfy the minimal standard of living requirements, but he must demonstrate that he has taken steps to minimize his expenses and maximize his income." *Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 438 (6th Cir.1998).

68. Since the Plaintiff has failed to establish an inability to maintain a minimal standard of living while fulfilling his student loan obligation, as required by the first *Brunner* factor, no purpose is served by an examination of whether any inability will persist into the repayment period, particularly since the second prong of *Brunner* is "exceptionally demanding" and requires a showing that circumstances beyond his control have resulted in a "total incapacity to repay the debt now and in the future." *Thomas,* 931 F.3d at 451.

69. To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction to consider the complaint pursuant to 28 U.S.C. §§ 1334 and 157. This Court has authority to enter a final judgment on all issues raised in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I) and (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

2. Section 523(a)(8) of the Bankruptcy Code excepts from an individual's discharge "a loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit . . . unless excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents."

3. "In its entirety, § 523(a)(8) balances two competing policy objectives: (1) the debtor's right to a fresh start; and (2) the need to protect the financial integrity of educational loan programs and to induce lenders to lend to students who cannot qualify for loans under traditional underwriting standards." *De La Rosa v Kelly (In re Kelly)* 582 B.R. 905, 909 (Bankr. S.D. Tex. 2018).

4. "The debtor bears the burden of proof on each prong of the test and if even one prong is not satisfied, the debt is not dischargeable.*" Lewis v. Mass. Higher Educ.*

*Assistance Corp. (In re Lewis)*, 2020 WL 489222 (Bankr. S.D. Miss. Jan. 29, 2020).

5. "The appropriate standard of proof for § 523(a)(8) is a preponderance of the evidence. *Johnson v. U.S. Dep't. of Educ.* (*In re Johnson*), 541 B.R. 759, 764 (Bankr. N.D. Ala. 2015).

6. Surprisingly, there is no precise definition of the term "undue hardship." It is not defined in the Bankruptcy Code nor has any particular judicial definition been endorsed by any decision of the United States Supreme Court. *Kettler v. Great Lakes Higher Educ. Serv. Corp. (In re Kettler)*, 256 B.R. 719, 722 (Bankr. S.D. Tex. 2000).

7. However, as courts have attempted to balance a debtor's need for a fresh start with the recognized need to protect student loan programs and their participants, a growing consensus has emerged regarding the evidentiary foundation necessary to establish an undue hardship.

8. Most of the circuit courts of appeal have endorsed a three-prong test first articulated by the Second Circuit Court of Appeals in *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2d Cir. 1987) under which a debtor is required to show:

   (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loan;
   (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and
   (3) that the debtor has made good faith efforts to repay the loan.

   *Id.* at 396.

9. This test was expressly adopted in 2003 by the Fifth Circuit. *U.S. Dep't. of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89 (5th Cir. 2003).[18]

---

[18] Having originated in the Second Circuit, the *Brunner* test has also now been adopted in the Third, Fourth, Sixth, Seventh, Ninth and Eleventh Circuits. Third: *Penn. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir. 1995); Fourth: *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393 (4th Cir. 2005); Sixth: *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397

10. "The test is conjunctive; a debtor's failure to satisfy any of the prongs means the debtor cannot establish that the student loans are an undue burden, and the student loans cannot be discharged." *Little v. U.S. Dep't. of Educ.* (*In re Little*), 607 B.R. 853, 858 (Bankr. N.D. Tex. 2019); *Russ*, 365 B.R. at 644.

11. Under the first *Brunner* element, the Debtor is required to show that he cannot maintain, based on his current income and expenses, a "minimal" standard of living for himself and his dependents if he is forced to repay the student debt.

12. "The first part of *Brunner*—that the debtor cannot maintain a minimal standard of living while repaying the student loan debt—comports with the legislative policy behind § 523(a)(8), that student loans should not as a matter of policy be dischargeable before [the debtor] has demonstrated that for any reason he is unable to earn sufficient income to maintain himself and his dependents and to repay the educational debt." *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1309–10 (10th Cir. 2004) (internal quotations omitted).

13. This analysis is actually a two-step process encompassing: (1) an evaluation of the debtor's present standard of living based upon his present lifestyle attributes which appear from the record, and (2) whether the forced repayment of the student loan obligation will preclude the debtor from maintaining a minimal standard of living. *Hoffman v. Tex. Guar. Student Loan Corp.* (*In re Williams*) 2017 WL 2303498, at *5 (Bankr. E.D. Tex. May 25, 2017) (citing *Naranjo v. Educ. Credit Mgmt. Corp.* (*In re Naranjo*), 261 B.R. 248, 254-55 (Bankr. E.D. Cal. 2001)).

14. "The first step in determining the minimal standard prong is to determine the debtor's monthly income. Next, the Court reviews the debtor's actual monthly expenses and determines which are 'reasonable and necessary.' The Court must apply its common sense knowledge gained from ordinary observations in daily life and general experience to determine whether Debtor's expenses are reasonable and

---

F.3d 382, 295 (6th Cir. 2005); Seventh: *Ill. Student Assistance Comm'n v. Roberson* (*In re Roberson*), 999 F.2d 1132, 1135 (7th Cir. 1993); Ninth: *United Student Aid Funds, Inc. v. Pena* (*In re Pena*), 155 F.3d 1108, 1111–12 (9th Cir. 1998); Tenth: *Educ. Credit Mgmt. Corp. v. Polleys* (*In re Polleys*), 356 F.3d 1302 (10th Cir. 2004); and Eleventh: *Hemar Ins. Corp. v. Cox* (*In re Cox*), 338 F.3d 1238, 1241–42 (11th Cir. 2003). The Eighth Circuit has elected to embrace a "totality of the circumstances" test in lieu of the Brunner factors. *Educ. Credit Mgmt. Corp. v. Jesperson* (*In re Jesperson*), 571 F.3d 775, 779 (8th Cir. 2009). The First Circuit saw "no need ... to pronounce our views of a preferred method of identifying a case of undue hardship," *Nash v. Conn. Student Loan Found.* (*In re Nash*), 446 F.3d 188, 190 (1st Cir. 2006), although its bankruptcy appellate panel has criticized *Brunner*. *Bronsdon v. Educ. Credit Mgmt. Corp.* (*In re Bronsdon*), 435 B.R. 791, 798–800 (B.A.P. 1st Cir. 2010).

necessary." *Graddy v. Educ. Credit Mgmt. Corp.*, 615 B.R. 336, 348 (N.D. Ga. 2020).

15. As a neighboring court recently observed,

> Tight finances [are] not enough. Generally, maintaining a minimal standard of living requires that a debtor be able to purchase "basic necessities," but what qualifies as a basic necessity varies among courts. Some courts adopt a narrow view, including only food, clothing, housing, and medical treatment. Other courts are more generous and have held that basic necessities should also include transportation, hygiene expenses, and modest recreation. Under either definition, courts agree that after purchase of basic necessities, a debtor may not use any discretionary income to the detriment of [the debtor's] student loan creditors. If some "belt-tightening" in the debtor's expenses could create an ability to repay, [a debtor] cannot satisfy the first prong.

*Trejo v. Navient* (*In re Trejo*), 2020 WL 1884444 at *5 (Bankr. N.D. Tex. Apr. 15, 2020).

16. In other words, the "minimal standard of living" element also requires the debtor to demonstrate that he or she is attempting to "minimize living expenses and maximize financial resources." *Justice v. Educ. Credit Mgmt. Corp.* (*In re Justice*), 2016 WL 6956642, at *3 (Bankr. N.D. Miss. Nov. 28, 2016).

17. A debtor seeking a hardship discharge of student loan indebtedness under § 523(a)(8) is not "entitled to maintain whatever standard of living [he] has previously attained, nor the level [he] would maintain if required to repay the debt. 'Minimal' does not mean preexisting, and it does not mean comfortable." *Halatek v. U.S. Dep't. of Educ.* (*In re Halatek*), 592 B.R. 86, 97 (Bankr. E.D.N.C. 2018).

18. "A minimal standard of living is living within the strictures of a frugal budget in the foreseeable future . . . " *Murray v. Educ. Credit Mgmt. Corp.* (*In re Murray*), 563 B.R. 52, 58 (Bankr. D. Kan. 2016).

19. The test does not require a debtor to demonstrate that repayment of the loan would cause the Plaintiff and his family to live at or below the poverty level. *Hutsell v. Navient* (*In re Hutsell*), 620 B.R. 604, 612 (Bankr. N.D. Ohio 2020); *Augustin*, 588 B.R. at 149.

Case 18-04015    Doc 167    Filed 02/24/21    Entered 02/24/21 15:03:52    Desc Main
Document    Page 14 of 16

20. However, a minimal standard of living "does not accommodate luxury-type expenses." *Halatek*, 592 B.R. at 98; *Crawley v. Educ. Credit Mgmt. Corp.* (*In re Crawley*), 460 B.R. 421, 436 (Bankr. E.D. Pa. 2011).

21. The evidence presented by the Debtor does not reflect compliance with the established legal requirement that "a debtor has a heightened obligation to apply his or her income to the repayment of a student loan before the loan may be discharged under § 523(a)(8)." *Miller v. Sallie Mae, Inc.* (*In re Miller*), 409 B.R. 299, 319 (Bankr. E.D. Pa. 2009).

22. Absent a compelling reason, a debtor's decision to send a child to a private school reveals a discretionary use of income that reflects a conscious decision by a debtor to ignore the mandated repayment of his student loan obligation. *Russ,* 365 B.R. at 645.

23. Indeed, though rare even under the more liberal standards of a Chapter 13 plan confirmation context, this Court has previously determined that private education expenses were "reasonable and necessary" under circumstances in which the debtor's son had a medically-documented learning disability and a social disorder which were proven through medical testimony. *In re Webb*, 262 B.R. 685 (Bankr. E.D. Tex. 2001).

24. However, "[a]lthough compelling circumstances may distinguish a given case, the authorities uniformly hold that a debtor's mere preference for private schooling is insufficient to qualify the attendant expense as necessary and reasonable." *Educ. Credit Mgmt. Corp. v. Savage* (*In re Savage*), 311 B.R. 835, 841 (B.A.P. 1st Cir. 2004).

25. Instead, "private school tuition is most often considered a luxury expense that amounts to a debtor requiring his or her creditors to donate toward his children's education." *Id*. at n. 9 [concluding that since $322.50 in private school expenses "can be eliminated from [Debtor's] budget without creating undue hardship, her student loans cannot be discharged under § 523(a)(8)."].

26. Because the Plaintiff has failed to establish the first element of the *Brunner* test by a preponderance of the evidence, the Court's inquiry regarding the dischargeability of the Plaintiff's student loan obligation concludes and the referenced student loan remains nondischargeable.

27. The Court need not decide whether the Plaintiff would have satisfied the second and third elements of the *Brunner* standards. *Faish*, 72 F.3d at 306; *Davis v. Conduent (In re Davis)*, 608 B.R. 693. 705 (Bankr. N.D. Ill. 2019) ["Such failure to succeed on the first element of the *Brunner* test . . . means that the student loans cannot be discharged."].

28. Without regard to the foregoing result, the Court feels compelled to respond to the Plaintiff's persistent urging throughout this proceeding for this Court to abandon the strictness of the *Brunner* test and apply a more liberal *ad hoc* standard of review.

29. This Court, of course, has no such freedom and is bound by the precedents established by the Fifth Circuit Court of Appeals in this regard.

30. However, the Fifth Circuit recently responded to a similar plea from a debtor with sympathetic circumstances with this unequivocal response:

> No doubt because so many student loans are ultimately backed by the taxpayers, Congress intended to make student loan debt harder to discharge than other types of consumer debt, and the courts' adoption of a linguistically accurate and demanding standard fulfills that intent. The consequence of the *Brunner/Gerhardt* test is that sympathetic debtors . . . are held to the same standard as debtors who are less sympathetic. But that is an outcome for Congress to address, should it desire. The text of § 523(a)(8) draws no distinction between debtors perceived as sympathetic or unsympathetic. It is undoubtedly true that each case of claimed "undue hardship" must be examined on its own facts, but reducing the *Brunner/Gerhardt* test to a nebulous 'totality of the circumstances' standard risks creating intolerable inconsistency of results. The proposed weaker standard would inevitably judicially expand an area of bankruptcy law that Congress has unambiguously sought to restrict.

*Thomas,* 931 F.3d at 454-55.

31. As the Circuit has advised, "Ultimate policy issues . . . are for Congress, not the courts." *Id*. at 455.

32. Because the Plaintiff, Bradley S. Epperson, has failed to establish by a preponderance of the evidence the existence of an undue hardship pursuant to § 523(a)(8) of the Bankruptcy Code, in accordance with the three-prong *Brunner* test adopted by the Fifth Circuit in *U.S. Dept. of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89 (5th Cir. 2003), the Court concludes that the relief sought by the Plaintiff's complaint must be denied.

33. To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

34. An appropriate judgment shall be entered which is consistent with these findings and conclusions.

Signed on 02/24/2021

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE